and others, number 153384. We'll hear from Ms. Welch. Good morning, your honors. May it please the court, I'm Mary Welch. I'm here on behalf of the defendants. This case presents two narrow issues. One is the intersection of section 1367 supplemental jurisdiction statute with sovereign immunity. And the second is about the PLRA's fee petition contribution that must, as this court held in Johnson, be made from the judgment. And the first question actually is the part that this court has to decide is pretty narrow. It's undisputed that 1367 does not give jurisdiction for state claims against unconsenting states. And it's also undisputed that Illinois does not consent to tort claims against itself and against the state. And further, it can't be contested that Illinois did not consent here. It said it raised sovereign immunity as a defense in its answer to the amended complaint, which the district court got wrong in the post-judgment order. It also appears in the district court's own final pretrial order. And then it came up again at the jury instruction conference and again at the post-judgment level. So certainly the plaintiff was on notice that the issue of sovereign immunity was in play. And also the plaintiff, as the one who was invoking federal court jurisdiction, had the burden of establishing it. So once we put it in play, then the plaintiff had certainly an opportunity at any point to get the court to make the decision. Because, again, jurisdiction is a question of law. It's not a question of fact. Actually, I'm not so sure about that. When I read the Illinois Supreme Court decisions dealing with these various efforts to sue state employees for wrongdoing of various kinds in the course of their employment, we see that court relying, for example, on expert testimony and factual determinations on the merits of the claims to decide whether the exceptions, for example, for malicious wrongdoing or violations of statutes or constitutional provisions take the case away from the Illinois Court of Claims. Well, that's not quite right. Certainly there are underlying facts, but these are jurisdictional facts for the court to decide. These are not merits. You know, the Illinois courts have been clear that you don't want to confuse the jurisdictional issue of sovereign immunity with the merits of the claim. Right? That's not – I believe that in the federal courts we do a pretty good job of trying to keep those issues separate. However, it is not clear to me that the Illinois Supreme Court and appellate courts do so to the same degree. Well, certainly it's an aspiration. I mean, they try to do this. I mean, they understand that it's a question of law, that it's review de novo. There are underlying facts, and I think it may happen that – Well, take Jenkins, for example, okay? Right. That was the one about mental care. Right, right, mental health professionals, yeah. And the Supreme Court winds up relying on expert testimony about differences between private and public hospitals, or there not being differences, to decide whether immunity applies. With that kind of background, I can understand why both the attorney general in the district court and the district court judge said, maybe we should give this to the jury. Well, let's say that the factual – as I read what the district court was saying in the jury instruction conference as I think about this, they were saying that the underlying – the district court judge was implying that if the jury found the fact of the battery happened, then there would be jurisdiction. And that's not correct. Why not? Well, let me say, because what the district court was saying was, if the jury finds it's unauthorized, if it's an actual – if he punched, if there was a throw, if there was a punch, if there was a choking, then we don't have jurisdiction. And this is at pages, say, 1882 through – oh, sorry, 1882 through 892. And this is not correct, because no state employee is authorized to commit a tort. So the district court's analysis, it's legal framework was incorrect. I understand the logic. And if you were dealing with federal issues, I would agree with you. But what do we make – this is the Illinois Supreme Court in 2015 in the Litaro case against the University of Illinois. The doctrine of sovereign immunity affords no protection, however, when it is alleged that the state's agent acted in violation of statutory or constitutional law or in excess of his authority. Right. But in excess of authority means the scope of your employment, and that in turn means – That's more in excess of authority. Right. Also in violation of statutory or constitutional law. Right. But also it's an allegation. You know, certainly no jury would get to decide what is and is not alleged. Again, this is a jurisdictional question. It's a question of law for the court. A court may make – you know, this happens in PAVI hearings, for example. Courts sometimes have to make their own – Of course. Right. But what – look, my big problem is, Welch, here, is what you've described would be a perfectly rational way of running an immunity regime, okay? It also fits well, for example, with respondeat superior. It fits with the way federal tort claims are handled. We don't ask whether the plaintiff has a solid claim on the merits. We ask whether the actor was acting within the course of his employment, read pretty broadly. That's not what I get from the Illinois Supreme Court cases, which seem much more reluctant to grant sovereign immunity, where the merits of the case show that a state actor has violated constitutional rights. Well, certainly constitutional rights. I mean, that's – I mean, the 14th Amendment takes care of that. I mean, certainly constitutional rights, there's valid abrogation. I mean, we can't raise sovereign immunity to claims like that. But for state – or for, I suppose, I'm not really sure, probably, state constitutional claims. But the question here, we have to remember that prison guards have a unique – they are unique in the scope of their employment. This is more like a high-speed chase for which there is sovereign immunity for troopers under Illinois law. I mean, that's what was accepted. What about the Curry case? I'm sorry? What about the Curry case? Well, this is the difference. He said he was in an emergency there and had to pull a U-turn. Right. And he didn't get immunity. Right. But he was not in the high-speed chase situation that the Illinois Supreme Court has held is, in fact, the sort of thing that only troopers or law enforcement can do. Which case was that? Well, I mean, Curry and Healy and the cases in Illinois. Which case distinguishes Curry to say that a high-speed chase is immune? I thought it was Curry. I mean, I will check. Curry did not get immunity. Right. But I thought Curry made that distinction. Well, the scope of Curry is difficult to understand. But I think, if I can say, what the Illinois Supreme Court does seem to be clear about is that when you have a duty that everybody has, which is what medical professionals have, which is what health care professionals have, you know, in the more recent case, when you have those sorts of duties, then that's the duty that you don't have, a breach of that duty you don't have sovereign immunity for. But as this Court, you know, recognized in Turpin, as the Illinois courts have held in Wozniak, for example, if you commit a tort that if what you do is a tort, and it's within what you do every day, the scope of your employment, if you make, for example, the false statements, which are not, nobody's authorized to make false statements, but that still is within your authority because those statements, if true, if not tortious, were within your authority. So the question here is, are guards different from everybody else? And the answer to that question is yes. They have the authority to use deadly force in certain circumstances. So the question is, did they have authority to do this in non-tortious circumstances? No. No. The question is whether a guard who commits a battery, that's a crime under Illinois law, right? It's a misdemeanor. It's a crime. It is a crime. The guard who commits a crime under Illinois law is immune from tort liability for doing so or can be sued only in the court of claims, right? Correct. So given the repeated statements as recently as last year in Leetaru, and including Fritz against Johnston, for example, we've got the Illinois courts repeatedly saying no immunity if you're breaking the law. Now, that's not much of an immunity, I'll grant you. But this is a question of state law where our job is to follow. But again, Fritz is distinguishable, and Fritz distinguished Wozniak, which is one of the cases we rely on. And there are a couple of things about Fritz. The crime at issue in Fritz was, in fact, a class 4 felony. And you can understand that Illinois courts would not give immunity, sovereign immunity, to a class 4 felony. And also the other thing that Fritz found significant was that this was not within making reports to another agency was not within these defendants' employment scope. And that was very critical to the Fritz analysis, as I understand it. Do we see case law distinguishing between misdemeanors and different levels of felonies for these purposes? No, but what we do see is Fritz distinguishing Wozniak as saying that when the tort, when what you do, if you did it in a non-tortious way, it would be the kind of thing you do on a daily basis or you have authority to do. In Wozniak and Turpin, you had authority, the defendants had authority to make statements in that context. Guards have authority to use even deadly force when they are guarding prisoners. And so that's the question. I mean, the question is not did they misuse it. The question is did they have authority to use up to deadly force in circumstances in a prison? And the answer to that question is yes. How about using it with malice? We have, and it would be helpful if you could identify the purpose of the employer that was served by the defendant's conduct in this case given the jury's verdict on the merits. Right. Okay. Well, first of all, about malice, if I may. In malice, malicious prosecution, there is sovereign immunity for malicious prosecution. That's not my question. I'm sorry. Look, I understand you may be very frustrated with the law from the Illinois Supreme Court on this subject. I read through these cases. I see Judge Feinerman was involved in a lot of these arguments when he was working for the state government. I understand you may be frustrated, but that's the material we've got to work with. And one of the things that it tells us is that if a plaintiff properly pleads malicious conduct and proves it, which would seem to have been done here, then there's no sovereign immunity. Well, in fact, Your Honor, the jury found that there was no malice because, well, at least on the second, the smaller claim. And, again, if the court accepts our argument about sovereign immunity, this would have a practical effect only on the $25,000 claim. I did want to ask you about the practical effect of this issue here. But, well, and the reason I'm talking about that is that there was a duplicate Eighth Amendment claim, and the jury found that there was no Eighth Amendment violation for this, for the one claim that there was a $25,000 verdict on battery for the throwing and the choking. And so the jury, by definition, found that there was no malice here because malice is what you need for the Eighth Amendment. Well, what did the instructions tell them about punitive damages, which they did award on that claim under state law? Right. That's true. But, again, Your Honor, there was no pleading of malice. And if you look at the complaint, the complaint, the word does not appear in the complaint. I actually checked it again last night. I did not see it in the Second Amendment complaint. And, in fact, if the jury found, I mean, to me that was inconsistent, that the jury would find that there was no malicious use of force, and that they found that there was no Eighth Amendment violation, and yet they had punitive damages. So, again, Your Honor, there's no, the jury itself, by its finding of no Eighth Amendment, found that the use of force with regard to the throwing and the punching, or, sorry, the throwing and the choking, was not a malicious use of force. What standard was required to award punitive damages on that claim under state law? Honestly, Your Honor, I don't remember the instruction. I'll take a look, but I assume it was pretty darn high. Yes, I would imagine. I don't know that it included malice. But, again, the jury's own finding was, you know, if it found for Smith on the Eighth Amendment claim with regard to the throw and the choke, then it necessarily found that there was no malice in particular. You're in a rebuttal time, madam, so you do what you want. Right. Thank you for the reminder. Just briefly, I'd like to talk about the PLRA fee question. The statute is quite clear. It says that a portion of the judgment not to exceed 25 percent shall be applied to the fees, and shall tends to mean shall in statutes. And, in addition, in Johnson, this court held en banc explained how this works, and what it said is that, you know, the attorney is entitled to up to 25 percent of the judgment, and what happens is if that's not enough to satisfy the fees, only then does the defendant have to kick in. The word satisfy, does that mean satisfy should be what, I guess, 25 percent is or more? Is 25 percent the minimum? Well, I think 25 percent is the minimum if the fees are more than 25 percent of the judgment. But if, for example, the judgment is $100,000 and the fees are only $10,000, only $10,000 of the judgment would have to go to the fees because it's up to 25 percent. So the plaintiff would not have to apply, the court would not have to apply 25 percent, $25,000 to a $10,000 fee award. Well, obviously. Right. Well, I shouldn't say obviously because that seems to me that the measure does go up. I forget the numbers are here, what, 300 and some thousand? Yeah, of the judgment, yes. And the judge will award 10 percent? Yes, that's correct. And you think it should be 25 percent? That's what this court decided in Johnson, Your Honor. And it had to decide. If that wasn't dicta, you had to know how the PLRA worked to know whether there was an equal protection violation. And I guess the purpose of that is the state has the right, and this goes back to the original part, the state has the right to at least say that the plaintiff, when wins, has to pay the attorney's fees at least about 25 percent. Right. If the judgment is at least 45 percent. And, of course, that reduces what the state has to pay in effect. Yes. Yes. If there are no further questions, I'll reserve the rest of my time. Right. Thank you, Ms. Welsh. For plaintiff, Mr. Rosati. Please, the Court, Fabian Rosati for the plaintiff. I really don't know how to begin or where to begin. But I guess I'll start out with the malice issue, and there's some ambiguity as to whether or not that was addressed by the jury. And I think that a telling indication that it was is the fact that they awarded more than $360,000 in punitive damages based on the conduct, as alleged and proven at trial, by the defendants, Robert Smith and Gregory Falk. This case came about after Plaintiff Charles Murphy was handcuffed and being escorted at the Vandalia Correctional Center in Illinois. As he was being escorted, he was not resisting. He was handcuffed, and he was punched in the side of the head. He sustained severe fractures to his orbital bones. His eyeball dropped down into the orbital socket. It required immediate emergency reconstructive surgery. Those facts were pled in the complaint. The doctor that performed the surgery testified at trial to the jury and explained the significance of those injuries and the gruesomeness of the injuries. At trial, Defendant Robert Smith was asked and shown a document entitled Constitutional Rights of Person to be Questioned, parenthetically Miranda Warning. He testified that the signature on that form was, in fact, his signature, and that can be found at Plaintiff's Exhibit 23 in the Beck file. The Beck file contains some sensitive materials that was introduced into evidence in its entirety back this past July. Portions of that Beck report were introduced at trial to the jury, including this Miranda waiver that was signed by Defendant Smith. Also testifying at trial was a Frank Squires. Frank Squires is a retired Illinois Department of Corrections investigator. Mr. Squires testified that he was responsible for investigating criminal acts within the department. Investigator Squires testified that the file, the Beck report, containing these reports, containing witness statements, et cetera, did not include any statement from Defendant Smith. Testifying at trial, Defendant Smith, when asked whether or not the claims as alleged in Plaintiff's complaint would amount to a criminal act, Defendant Smith testified, yes, they would, on two separate occasions at least. Now, is that a tort? What's a criminal act? A criminal act is alleged in the complaint amounted to an aggravated battery, which is a felony in Illinois law. The Plaintiff's complaint alleges at appellate brief, appellee brief, page 10, quote, On or about July 25, 2011, at the Vandalia Correctional Center in Vandalia, Illinois, Defendant Officers Smith and Lieutenant Falk committed a battery against Plaintiff. Specifically, while Plaintiff was handcuffed and not resisting any jail personnel, Defendant Smith punched Plaintiff in the face and head. Thereafter, said defendants choked Plaintiff and threw Plaintiff into a cell, causing him to strike his face on a metal toilet bowl, causing serious and permanent injury to Plaintiff, including a right orbital fracture requiring reconstructive surgery of the right orbital floor at St. John's Hospital in Springfield, Illinois, on July 26, 2011. I pulled the statute in Illinois for aggravated battery. That could be found at 720-ILCS-512-3.0581. Offense based on injury. A person commits aggravated battery when in committing a battery, other than by firearm, he or she knowingly does any of the following. One, causes great bodily harm or permanent disability or disfigurement. Dr. Brenner testified at the trial that Plaintiff was warned if he didn't have immediate surgery, he was in risk of permanent impairment of vision in his right eye. Plaintiff underwent that surgery. Relative to Plaintiff's waiver argument. You said it wasn't a waiver of sovereign immunity? We argued, the Plaintiff asserted in his appellee brief that the defendants essentially committed a waiver, a federal rules of civil procedure waiver, through their conduct throughout the litigation. Specifically, they demonstrated an intent to defend all claims on the merits. In fact, they filed two motions for summary judgment throughout the litigation. One was a partial motion for summary judgment, which addressed Plaintiff's federal and state conspiracy claims. Counsel, if we ever said that a party waives an issue by failing to file a pre-trial dispositive motion on it, when it's raised in the answer and it's part of the final pre-trial order? I understand and I would respond by saying I do not believe so. However, the state consented to the federal court jurisdiction relative to Plaintiff's state conspiracy claim. That issue was ruled on by the state. It was presented by the defendants to the state for a ruling. They didn't assert their sovereign immunity. They had an opportunity to assert that as well in their motion, that dispositive motion. They didn't do so. But they did argue that that state claim should have been dismissed. It wasn't dismissed. It was partially dismissed. But Plaintiff's position is that they consented to the jurisdiction. What part was dismissed? Just remind me of that. The federal conspiracy claim and the state conspiracy claim were presented in one summary judgment motion. So they were strictly state claims? Correct. So the district court dismissed the federal claim based on an inter-corporate conspiracy doctrine. And they denied the state claim, which Plaintiff was allowed to bring to trial. It was ultimately dismissed, I believe, at a Rule 50 or 59 motion after the close of the Plaintiff's case. Mr. Rosati, can I ask you briefly to address the attorney fee issue under the Prison Litigation Reform Act? If I understand your position correctly, the district court simply has unfettered discretion to decide what amount of a verdict, up to 25 percent of it, should be ordered or should be allocated to a fee award. Is that right? Well, I don't think it's unfettered. I think that within the parameters of the specific – Where do you find fetters in this statute? So we're looking at section D. 2. The provision in Plaintiff's interpretation does not require 25 percent. I understand that. Okay. But your position seems to leave it to the whim of the district court. Suppose the district judge just awarded a dollar out of the verdict for the fees. Well, that would be discretionary. It's 25 percent. It is pretty clear from the statute in the black-and-white interpretation. I think Parker would be responsive. The Third Circuit helps you, yes. But the Third Circuit didn't really provide any guidance as to how such discretion should be exercised, did it? That Third Circuit case in Parker v. Conway did squarely address the issue. I understand. It said it agreed with you that it's discretionary. Did it provide any guidance as to how that discretion should be exercised? And the follow-up question, in essence, is what purpose do you think is being served by that statutory provision? I think the purpose is clear. It's to save the state treasury funds when you're dealing with the allocation of the fees. These claims more like tort claims in terms of their economics, right? Correct. And I think at the same time, from a logical, I don't know if that's the correct word, but from a certain standpoint, that you need to look at the totality of the circumstances and the facts of the specific case when determining whether or not the full 25 percent could be allocated. The plaintiff argued in his post-trial response motion, the defendant's post-trial Rule 50 motion, that we broached the issue many times to forego litigation. So does it wind up being punishment for not settling? What's going on? Well, to a certain extent, this case went on for over two and a half years. And we were willing to come to the table during the litigation. So are you saying the discretion should be exercised, in essence, according to the district judge's evaluation of settlement positions pre-trial? I think that more than that may come into play, the severity of the injury. Should that be relevant? I'm sorry. Should that be relevant, the assessment of reasonableness in settlement positions? I believe it should be a part of the component in determining what. I'm not aware of any place in the law where we say how much you win depends on how reasonable you were in settling. I don't have any support for that. I don't see any. I would argue that the severity of the injuries and the egregiousness of the conduct of the defendants would be more of something to look into when determining whether or not 25 percent should be in full force. And here in this specific case, again, the plaintiffs are saying gruesome injuries. And there was no basis for these injuries. He could have been put in his cell and it was argued to the jury. There was no need to punch him in the side of the head to that great extent, throw him into the toilet bowl, and leave him. And they didn't call for medical attention. He was on the floor for over an hour and a half. Testifying at trial, the first nurse responder was the wife of the guard, Defendant Falk. She wrote in her report, they didn't know how the injury occurred. Plaintiff testified, he told the nurse, Falk's wife, how the injury occurred. I asked Falk how she got to the segregation unit to first treat Plaintiff Charles Murphy. She testified that a Sergeant Eckert called her, picked her up in a vehicle, and drove her to the segregation unit to treat the plaintiff. Immediately after testifying, Sergeant Eckert was put on the stand. Sergeant Eckert didn't recall ever calling Nurse J.C. Falk or driving her anywhere that day. Well, she couldn't have got there on her own. Pardon me? She couldn't have got there on her own, right? Correct. And that's where he was. Correct. And it was within 30 or 35 minutes from the injury. It's in dispute, but Plaintiff's position is he didn't see a nurse until over an hour and a half. That long? Yes. Okay, well, somebody got her there. Somebody drove her there, and she testified it was Sergeant Eckert. Eckert testified he doesn't remember driving her anywhere or calling her that day. He doesn't remember driving anybody there. No. He did remember placing the handcuffs on Charles Murphy, the plaintiff, earlier, just before he was transported or escorted to segregation. So he remembers the day. He remembers putting the handcuffs on, but he doesn't remember driving or calling her. You know, there's no question the state pays, right? Well, it would appear that there was immunity given to the defendants. You mean indemnity? Indemnity, that's correct. Yeah, that's what I mean. I mean they pay. That's why. When they get sued, and this is completely outside whatever they're doing, which was supposedly taking the prisoner handcuffed to his cell, and that's when he got beat up and threw him in the cell and stripped him and all the bad things that are bad. That's correct. We're not disputing that transporting an inmate is within the scope of his duties, but committing an aggravated battery and punching a harmless inmate. The way he did it was what you're complaining about. Correct, exactly. It was outside what normally you would do, obviously. That's why I wondered to what extent this is limited. But wouldn't that be something to go against the prisoner? I mean, I'm sorry, the sergeant? I mean, I don't know, you disown them? I don't know what you do when you have somebody that acts up like that. They're still going to have to pay, as I understand it, the state. Yeah. Does Illinois indemnify for punitive damages? I'll ask Ms. Welch on that. I believe if there's indemnification, you may want she'd be better to respond to that. I would think you'd be as motivated as anybody to know the answer to that question in this case. I'm sure I'd have already known or found out if they weren't. We probably wouldn't be here. I do note the magistrate judge's comment about how extraordinary this verdict was based on the evidence that she showed. If I could ask you briefly, though, Mr. Rosiata, to address this immunity issue. I found it, at least in looking at a number of the Illinois cases, the Leetaru case, the most recent one, fairly helpful because, frankly, the dissent describes a regime that makes more sense to me in the sense of saying we don't want to confuse the merits with the issue of immunity. But it was, in fact, the dissent. And the Illinois Supreme Court seems to be much more open to limiting immunity where state actors have done serious wrongs to people. Part of my concern here is that I worry that you're asking us to, in effect, disagree with some of our prior decisions, such as the Brooks and Turpin cases. And I'm wondering what you might have to say about that. Well, I think Turpin, the standard that I walk away from after reading it or analyzing it is the but-for standard. In other words, but-for, Defendant Smith being a correctional officer and but-for him being employed at the Vandalia Correctional Center, he would have never made any contact with the plaintiff, and therefore sovereign immunity is triggered. But plaintiff's position is that the Illinois Supreme Court has rejected that and has instead followed the source of the duty. In other words, it was Defendant Smith and Falk's duty not to punch plaintiff and not to choke and throw him, regardless of their presence on state property. I think to make that point, you've relied on the Fritz case. Is that right? Fritz is another one. It's one of them. Now, Fritz was decided before our decision in Turpin, and that sounds like just an argument that we were wrong in Turpin. That's why I'm interested in the Litaru case, which came as recently as 2015, and reinforced some of these notions, this fairly limited scope of immunity. I think to respond to that, what we're dealing with here as far as the facts, there's a big difference in facts and the set of circumstances and facts here. We're claiming an intentional criminal act that was actually testified to by the defendants that would, based on the allegations, would these facts constitute a criminal conduct, and you don't find those facts in the other cases. In here, he committed a battery and it resulted in serious injury to Charles Murphy. He was caused to undergo a very painful surgery, and the doctor testified to that and the jury listened to that, and they determined that it warranted the jury the verdict that they returned. With the punitive damages, which you'll be discussing that in a minute, there seems to be, I can understand punitive damages, but it sounds like this is a permanent injury with severe damage, et cetera, and I don't even know why the damages in this amount would be punitive or at least have to be labeled that. Because I know I've been a long time away from state claims, but punitive damages always took extra, and a lot of times insurance companies, for instance, don't indemnify for punitive damages, and I think that's why Judge Hamilton's question, but it seems like a large percentage of this judgment were punitive damages. Is that correct? Correct. I mean, way more than whatever you want to call the other damages. It's the personal injury damages. It was significant, and the district court reduced that by some $100,000, so the $409,751 was reduced to $300,000. Yeah, he brought down the total, that's right. Correct, and significantly. He also knocked down my attorney fees significantly, and it should be noted that this case was referred to me by the Illinois Lawyer Finder. Yeah, you made a noble effort, no question about that. And regardless of the outcome of this appeal, a substantial verdict remains, along with the fee award, in recognition of very serious injuries inflicted. Thank you very much, Mr. Rosati. Thank you. Ms. Welsh, rebuttal? To go back to your earlier question, Judge Hamilton, Curry v. Lowe, in fact, did make the distinction between a high-speed chase and just driving like a normal person, and that's at 148 Ilsecond, 158 through 63, and we mentioned that on our reply brief at page 13. And also we mentioned on page 13 that this court approved sovereign immunity for a high-speed chase in Madziak, which is 16F3rd at 1049, which we also mentioned at page 13 of the reply brief. So it depends on whether you're responding in your jurisdiction and how fast you're driving. Well, it depends on whether your unique governmental function allows you to violate certain laws. And when you're a law enforcement person engaged in a high-speed chase of a suspect, you are allowed to break some laws and you will have sovereign immunity for that. And similarly, the unique governmental function of prison guards is that they can use up to deadly force. No random person can do this other than prison guards and law enforcement. Self-defense. Citizens can do that in self-defense, right? In certain circumstances, right. But, I mean, again, but not in the course of employment. I mean, I cannot use deadly force in my state employment. I'm not authorized to do that. But prison guards are. And, again, one of the things we need to think about is in sovereign immunity contemplates, this is a factor in the determination, is will a judgment in a battery case against a guard control the actions of the state? And, yes, it's sort of like qualified immunity. It has the same, I think, underpinnings of qualified immunity. Should guards be worried about a battery judgment against them every time they use force against someone? And the answer to that is no. They have a unique governmental function that allows them. Well, they're already vulnerable to 1983 claims, right? I'm sorry? They're already vulnerable to 1983 claims. Correct. What's the indemnification practice here? Well, the Indemnification Act permits the, I believe permits the Attorney General's Office to make that determination about whether someone will be indemnified. For actual damages or punitive damages or both? Well, I believe for both, actually. But punitive damages is usually the question. I just want to ask one of the questions to get the focus. Obviously, there's no, it would require a prison guard on duty to have been a prison guard on duty to commit these kind of vicious acts. Right. I mean, a chaplain couldn't do this, right? Yeah, well, I'm just trying to be compliant because I have to say I don't, I'm not as lucid on all the state. I'm sorry? I'm not as lucid on all the state cases that Judge Hamilton was reciting there, but it's certainly within the capacity of a person taking a prison guard, taking the prisoner from one place to another. Correct. It requires a prison guard to do that. Nobody else can do that. Correct. Exactly. And they did this in that line of duty, and they went way outside of that in the way they did it. That's exactly right. So I have to say I'm a little bit perplexed on the sovereign immunity issue and also on the, well, we won't get into the attorney's fees. Right. Well, certainly the case law could be clearer on sovereign immunity in the Illinois courts, but I just want to make one last point. The plaintiff didn't allege that there was a crime. He never even provided authority to show that this was a crime, and he has never, ever before today compared it to aggravated battery. So, again, if I can just close, the only practical effect of finding that there was no sovereign immunity over these claims would be to vacate the one battery judgment against the $25,000 approximate battery judgment against Smith for the throw and choke count. And, again, because this is more like a high-speed chase than it is like driving down the street. Guards are more like troopers. Ms. Welch, if we did that, if we set aside that $25,000 in punitive damages, could the plaintiff go to the court of claims and pursue that claim? Certainly that's the kind of claim that, as we pointed out, is brought to the court of claims on a regular basis, battery claims. Could he do so now? If we were to say there was no jurisdiction in the district court? I'm not sure about the timeliness question. Does Illinois have a journey accounts statute, I assume? I'm sorry? A journey accounts statute if a case fails on jurisdictional grounds, it can be brought up anew in the proper court? Actually, yes, generally speaking, I think they do. I'm not sure of that. But I will say that my understanding from Rager, which is the case that the United States Supreme Court said you can't use 1367 against unconsenting states, that that was actually about the tolling provision in 1367, and it said that that wouldn't apply for claims against unconsenting states. So I'm not sure what Illinois law would do, but apparently under 1367 it wouldn't. Thank you, counsel. The case will be taken under advisement. Thanks to both counsel for the presentations on behalf of your clients